1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHIZOMA C. NJOKU, | ) | 1:10-cv-00948 GSA |
| | ) | |
| Plaintiff, | ) | **ORDER REGARDING PLAINTIFF'S** |
| | ) | **SOCIAL SECURITY COMPLAINT** |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————————— | ) | |

## **BACKGROUND**

Plaintiff Chizoma C. Njoku ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income benefits pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (*See* Docs. 8 & 9.)

1

1

## FACTS AND PRIOR PROCEEDINGS[2]

2   Plaintiff protectively filed an application for supplemental security income benefits in

3   March 2004, alleging disability beginning January 1, 1997.  AR 53-56.  Plaintiff's application

4   was denied initially and on reconsideration, and Plaintiff requested a hearing before an

5   Administrative Law Judge ("ALJ").  AR 19-27.  ALJ Bert C. Hoffman held a hearing on August

6   10, 2006, and issued an order denying benefits on February 12, 2007, finding Plaintiff was not

7   disabled.  AR 11-17, 338-344, 399-440.  On October 4, 2007, the Appeals Council denied

8   review.  AR 4-6, 352-354.

9   Following a Stipulation and Order for Remand, issued by Magistrate Judge Dennis L.

10  Beck on August 15, 2008 (AR 346-347, 350) in this Court's case number 1:07-cv-01694-DLB, a

11  second hearing was held on March 12, 2009.  AR 637-663.  ALJ Hoffman issued a second order

12  denying benefits on May 7, 2009, again finding Plaintiff was not disabled.  AR 322-334.

13  **2006 Hearing Testimony**

14  ALJ Hoffman held a hearing on August 10, 2006, in Fresno, California.  Plaintiff

15  appeared and testified; she was represented by attorney Melissa Proudian.  Plaintiff's counselor

16  Anita Quiroz also testified.  AR 266-307.

17  Plaintiff was born April 13, 1985, and was twenty-one years old on the date of the

18  hearing.  AR 269.  She was born in Los Angeles to an American mother and a Nigerian father.

19  AR 276.  She has traveled to Nigeria and looks forward to visiting Nigeria again this year as it

20  has been about ten years since she last visited with her family.  AR 276; *see also* AR 291-292.

21  Plaintiff is five foot seven inches tall and weighs about 250 pounds.  AR 270.  She has never

22  learned to drive and does not have a driver's license.  She has a seizure disorder and has been

23  advised by her physician that she cannot drive.  AR 270-272.

24

25

26   _____

27   [2]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

28   2

Plaintiff currently resides in a care facility, after having previously lived with various family members, including her aunt, mother, and father. AR 278. She has also lived in the home of one of her father's friends because she had difficulty getting along with her stepmother. AR 278. At the care facility, Plaintiff has a roommate. She wants to live on her own. AR 283. In the past she has enjoyed cooking, but at the care facility all food preparation and laundry is taken care of. AR 283-284; *see also* AR 293-294. Saturdays provide an opportunity for free time between 8 a.m. and 8 p.m. In the past two or three months, Plaintiff has left the facility to go to the movies or a friend's home. AR 284-286.

The care facility provides a stipend of about $30 a week. AR 285. Plaintiff uses these funds for bus fare or to buy clothes. AR 285, 293. She may also use the money to buy "sodas or cookies." AR 293.

As a member of Central Valley Regional Center (CVRC), Plaintiff receives a variety of services, in addition to having been placed in a care home. CVRC covers the cost of her seizure medication and provides her with the assistance of a counselor. AR 279. She sees her counselor two or three times in a two-week period and can call if needed. AR 279.

While Plaintiff did not graduate from high school, she attended through the eleventh grade. AR 273. She did not earn enough credits to graduate. AR 274. During the course of her education she was enrolled in special education classes for math and English. AR 273. Since leaving high school, Plaintiff has tried to pass the GED test, but has been unsuccessful. AR 274. When she was asked about vocational training, Plaintiff indicated she participated in a program previously through the school and worked for about two weeks at Old Navy. However, she stopped working there after having a seizure in the car as her father drove her to work. AR 277.

Plaintiff can read English. She enjoys romance novels and reads the Sports section of the newspaper to follow Raiders football. AR 275-276. Plaintiff also enjoys watching Lifetime channel movies. AR 294.

1    When asked about her appearance, and particularly her nails, Plaintiff indicated that she

2    enjoys making herself look nice.  AR 282.  She gets her nails done about every two weeks and is

3    often driven there by the people at the care facility.  AR 282.  Grooming is important to her and

4    she makes it a habit to be well groomed.  AR 282-283; *see also* AR 303.

5    Plaintiff currently takes prescription medications Tegretol and Trileptal as prescribed, and

6    dispensed by the care facility.  AR 280-281.  One side effect of the medications is drowsiness.

7    AR 281.

8    Plaintiff indicated she is working at "CIP," putting together "overnight packets" for about

9    an hour, every other day.  AR 286.  Then the group with whom she works will travel to a

10    bookstore or fast food restaurant for an activity.  AR 287.  Prior to this position, Plaintiff worked

11    at the "Production Center" for a half-day.  The job required placing labels on boxes, counting

12    labels, or putting nails in bags.  AR 287-288.  Transportation was provided by CVRC and

13    assistance was provided by a job coach.  AR 288.  She left this position because she had

14    difficulty getting along with some of the other participants.  AR 288-289.  When she was asked

15    what she would like to do for work, Plaintiff indicated she might like working in a clothing store.

16    AR 290-291.

17    Although she no longer attends regularly because she lives at the care facility, Plaintiff

18    used to enjoy going to church every Sunday with her maternal grandmother.  AR 292-293.

19    Plaintiff's counselor at CVRC, Anita Quiroz, also testified.  AR 295.  Ms. Quiroz has

20    been employed by the facility for over six years and has a master's degree in marriage and family

21    therapy.  AR 296.  She assists about sixty-five to seventy clients; one of her clients is Plaintiff,

22    with whom she has worked for about six months.  AR 296.

23    When Ms. Quiroz initially met her, Plaintiff was living with a family member, about to

24    become homeless.  Ms. Quiroz assisted in finding Plaintiff a place to live that would provide

25    adequate supervision and a sheltered workshop.  AR 296.  Ms. Quiroz estimated that she sees

26    Plaintiff on average about once a week.  AR 297.  Ms. Quiroz indicated that Plaintiff has had

27

28    4

1   difficulty in workshop placements due to behavioral issues or an inability to follow instructions.

2   AR 297.

3          In the workshop where Plaintiff is currently placed, there is less emphasis on actual work

4   and more emphasis on socialization.  AR 298.  CVRC refers to the program as "pre-vocational."

5   AR 298.  While Ms. Quiroz has not personally supervised Plaintiff at her work placements, she

6   has been advised by other personnel, including Plaintiff's job coach at the Association for

7   Retarded Citizens, of the difficulties Plaintiff has had.  AR 298.  In Ms. Quiroz's opinion,

8   Plaintiff is not capable of working in a job outside of the sheltered workshop scenario as a job

9   would typically be performed in the national economy.  AR 298; *see also* AR 300-301.  She is of

10  this opinion because Plaintiff has difficulty understanding appropriate behavior and lacks the

11  ability follow directions properly.  AR 299.

12         CVRC's ultimate goals include moving Plaintiff to an apartment.  The center would

13  manage her money and pay the rent, and provide supervised visits by facility personnel several

14  times a week to check on her and otherwise ensure Plaintiff was not being taken advantage of.

15  AR 299.

16         Ms. Quiroz indicated that Plaintiff is dependent upon others, whether it be her counselor,

17  the house manager, or staff at the facility.  She requires "quite a bit of assistance just to get

18  through her daily and weekly routines."  AR 300.  While Plaintiff is higher functioning than

19  some of the other CVRC clients, she was not able to perform the work that the other high

20  functioning clients of CVRC perform.  AR 301.

21         When asked by the ALJ about the percentage of clients who "go on to function totally

22  independently," Ms. Quiroz estimated about five percent of the CVRC clients could do so.  AR

23  303.

24  //

25  //

26  //

27

28                                                5

**2009 Hearing Testimony**

ALJ Hoffman held a second hearing on March 12, 2009, in Fresno, California.  Plaintiff appeared and testified and was again represented Ms. Proudian.  Sergio Bello, M.D., also testified as a medical expert ("ME").  AR 637-663.

Plaintiff (now 23 years old) lives on her own in an apartment.  Her father pays the rent. AR 639. While she has been living on her own for the past four to five months, she spends her days with her mother because of her seizures.  AR 645.

Plaintiff last worked in recyclables for the Equal Opportunities Commission but quit the first day because she could not work from the back of a "trash can truck" because of her seizure disorder.  AR 641.  She is not currently attending school.  AR 645.

With regard to her seizure disorder, Plaintiff testified she continues to have seizures and "they're not even controlled."  AR 641.  When asked about a discrepancy in the medical record wherein Plaintiff's father told a physician that she had not had a seizure in years, Plaintiff explained that her father does not live in Fresno and that he is not familiar with her seizure condition.  AR 641-642.  More particularly, with regard to control of her seizure disorder, Plaintiff testified that she continues to suffer from blackouts and loss of urine during sleep.  AR 643.  When asked about a notation in the medical record that as of December 2008 she had not had a seizure for four to five months, Plaintiff indicated that every time she sees her physicians she tells them she has had seizures.  AR 644-645. Recently Plaintiff's seizure medication dosage was increased, however, the increased dosage made her feel unwell, she became "woozy" and sleepy, and did not "feel like [herself]."  AR 647.

Plaintiff also suffers from headaches three or four times a week, describing them as "very bad, very, very bad."  AR 648.  When she was asked what medication she takes to treat the headaches, Plaintiff replied "Midol" or "Iburpofens."  AR 649.  At her most recent doctor visit, Plaintiff advised her physician of the headaches and the fact she was "wetting herself" overnight. The doctor increased the dosage of her seizure medication on that occasion.  AR 649-650.  With

6

regard to the incontinence, Plaintiff indicated this occurs only at night and about two to three times a week.  AR 650.

ME Bellow testified that Plaintiff does not meet or equal any listing impairment.  AR 651.  With regard to her seizure disorder, the ME testified that persons with seizure disorders can work in positions that avoid hazards of any kind.  AR 651.  When questioned by Plaintiff's attorney, the ME indicated he questions the frequency of Plaintiff's seizures due to certain inconsistencies in the record.  AR 652-653.  With specific regard to the hazards, the ME indicated heights and moving machinery should be avoided.  AR 653.

The ME indicated that headaches can be a symptom of seizures, yet indicated there was no specific type of headache associated with a seizure disorder.  AR 654.  Incontinence is also a symptom associated with seizure disorders.  The incontinence can occur during the day or night. AR 654.  When persons are having seizures over night, a potential problem arises with regard to how often the seizures are occurring, meaning the seizures go unnoticed.  AR 654.  The ME indicated that the incontinence could also be caused by something other than a seizure.  AR 654-655.

The ME reviewed the electroencephalograms of January 2004 and June 2007.  He acknowledged Plaintiff has a seizure disorder that is not specifically typed, but believes the disorder to be controlled.  AR 655-659.

**Medical Record**

The entire medical record was reviewed by the Court.  The medical evidence will be referenced below if necessary in this Court's decision.

**ALJ's 2009 Findings**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 322-334.

More particularly, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 26, 2004.  AR 324.  Further, the ALJ identified the following severe

1    impairments: a seizure disorder and borderline intellectual functioning.  AR 324.  Nonetheless,

2    the ALJ determined that the severity of the Plaintiff's impairments do not, individually or in

3    combination, meet or exceed any of the listed impairments.  AR 324-326.

4          Based on his review of the entire record, the ALJ determined that Plaintiff has the

5    residual functional capacity ("RFC") to perform the full range of work at all exertional levels,

6    with the nonexertional limitation to simple and repetitive tasks, and avoiding jobs involving

7    unprotected heights, moving machinery or driving automotive equipment.  AR 326-333.

8          Next, the ALJ determined that Plaintiff did not have any past relevant work.  AR 333.

9    Nevertheless, based upon Plaintiff's age, education, work experience and RFC, the ALJ

10   determined there were jobs that existed in significant numbers in the regional economy that

11   Plaintiff could perform.  The ALJ further determined that Plaintiff's nonexertional "limitations

12   have little or no effect on the occupational base of unskilled work at all exertional levels."  AR

13   333-334.

14                               **<u>SCOPE OF REVIEW</u>**

15         Congress has provided a limited scope of judicial review of the Commissioner's decision

16   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

17   this Court must determine whether the decision of the Commissioner is supported by substantial

18   evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

19   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

20   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

21   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

22   401.  The record as a whole must be considered, weighing both the evidence that supports and

23   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

24   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

25   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

26   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

27

28                                         8

Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the application date; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1; (4) has no past relevant work; and (5) has the RFC to perform work that exists in significant numbers in the national economy. AR 322-334.

Here, Plaintiff argues that she meets or equals Listing 12.05C, and therefore, the ALJ erred by denying her benefits. Relatedly, Plaintiff also asserts the ALJ failed to comply with the remand order in that regard. (Doc. 16.)

**DISCUSSION**[3]

***Listing 12.05C***

Plaintiff contends she meets or equals Listing 12.05C, and therefore should be entitled to benefits as a disabled person.  More specifically, Plaintiff argues her IQ scores meet the first prong of the listing, and her seizure disorder qualifies as a severe impairment that significantly affects her ability to perform work activities. (Doc. 16 at 11-29.)  The Commissioner asserts in reply that while Plaintiff's IQ scores satisfy the listing criteria, her seizure disorder does not. (Doc. 21 at 16-20.)

The Disability Evaluation Under Social Security (Blue Book September 2008) defines mental retardation as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> A.  Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
> OR
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
> OR
> C.  *A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function*;
> OR
> D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace;
> or
> 4.  Repeated episodes of decompensation, each of extended duration.

Emphasis added. *See* http://www.ssa.gov/disability/professionals/bluebook/12.00.

---

[3] The Court has carefully reviewed and considered all of the pleadings, including arguments, points and authorities, declarations, and exhibits.  Any omission of reference to an argument or pleading is not to be construed that this Court did not consider the argument or pleading.

10

In his findings, the ALJ determined as follows:

Per the District Court's order, I considered Listing 12.05C pertaining to mental retardation, but, as explained below by expert testimony, the claimant's impairments are not severe enough to meet the criteria of the Listing.  Listing 12.05C requires a valid IQ score of 60 through 70 plus a physical or other mental impairment imposing additional or significant work-related limitation of function.  Here, the claimant has the IQ of 60 to 70, but her seizure disorder does not cause significant work-related limitations beyond the standard seizure precautions.

The claimant's mental impairment has been considered under the requirements of all subsections of listing 12.05.  Mental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  Here, however, the claimant's high level of adaptive functioning negates a diagnoses of mental retardation and renders her borderline intellectual functioning not disabling.

The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.  However, even if the claimant were considered mentally retarded, none of the paragraphs are satisfied.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  I obtained testimony from a medical expert, Sergio Bellow, M.D., who testified by telephone at the hearing.  Regarding seizures[4] as an additional impairment, the doctor stated it is not the disorder but the frequency of the seizures, and the claimant's statements and the records disagree.  He said the frequency of the seizures do not meet or equal a Listing.  Dr. Bellow further testified that records indicate that the seizures can be controlled with medication.  He also said he had a difficult time with the claimant's statement in December 2008 that she had grand mal seizures two to three times a week because the documentation is poor, and those type of seizures need ER treatment, which is not there.  He also questioned her credibility in her statement that she had no seizures for four to five months, yet wet the bed every night, and said it was caused by seizures.  Dr. Bello commented that there is no place in the record that says seizures were witnessed.  He stated there is no evidence of seizures when the claimant was taking the correct medication.  Therefore, I find that, although the claimant has an apparently valid IQ between 60 and 70, her seizure disorder does not impose significant work-related limitations of function.  Dr. Bello noted that SSI seizure precautions [provide for] not working around heights, hazards, and machines, which are a limited part of the environmental functions of work.  Given the credible objective seizure evidence, the impairment should be non-severe because the infrequency with which they occur.  However, giving the claimant every benefit, I have included

---

[4]The record reveals an abnormal December 14, 2005, electroencephalogram stating "[s]pike and wave activity in right front head region is consistent with interictal epileptiform activity.  Although not diagnostic of epilepsy, this would be consistent with a diagnosis of epilepsy."  AR 227, 493.  On June 25, 2007, an electroencephalogram study notes "intermittent slow waves are seen, particularly in the region of T4," and "[t]he study could be found in someone with a history of seizures."  AR 521.

1   seizure precautions in the residual functional capacity.  The seizures do not cause
2   the claimant to have limitations in the exertional, postural, or manipulative
    functions of work.
3   AR 325-326.

4        In a psychological evaluation of February 17, 2006, clinical psychologist Michael S.
5   Kesselman administered the Wechsler Adult Intelligence Scale-III (WAIS-3) and the Wide
6   Range Achievement Test-III (WRAT-3).  AR 214.  The scaled scores following the WAIS-3
7   testing yielded a Verbal IQ score of 70, a Performance IQ of 68, and a Full Scale IQ of 66.  AR
8   214.  The reading portion of the WRAT-3 testing yielded a standard score of 82 with a grade
9   level equivalent of sixth grade.  The mathematics portion of the WRAT-3 yielded a standard
10  score of 63; a score consistent with an individual who is mildly retarded.  AR 215.  On the
11  Vineland Adaptive Behavior Scales II (Vineland) Plaintiff received scores suggestive of low
12  normal adaptive functioning.  AR 215-216.  Dr. Kesselman's diagnosis included provisional mild
13  retardation and provisional borderline intelligence, rule out mild retardation.  AR 216.

14       On October 16, 2006, Clinical Psychologist Richard Engeln also performed a
15  psychological evaluation of Plaintiff wherein the WAIS-III was employed.  AR 244.  On this
16  occasion, testing revealed the following scores: Verbal IQ - 77, Performance IQ - 66, and Full
17  Scale IQ - 69.  AR 246.  Dr. Engeln's diagnosis includes "phase of life adjustment as young
18  adulthood," "Adjustment Response to seizure disorder," and "Academic Delay, moderate to
19  severe."  AR 247.

20       First, onset is not an issue here.  Plaintiff's IQ scores were obtained prior to her attaining
21  the age of twenty-two.  More particularly, when tested by Dr. Kesselman, Plaintiff was twenty
22  years old.  AR 213.  When Plaintiff saw Dr. Engeln, she was twenty-one years old.  AR 244.

23       Next, Plaintiff's valid verbal, performance and full scale IQ scores, as recorded by Dr.
24  Kesselman, all fall within the 60 through 70 range.  Moreover, Plaintiff's performance and full
25  scale IQ scores obtained by Dr. Engeln also fall within the 60 through 70 range.  Thus, the first
26  prong of Listing 12.05C is met.

27
28                                        12

The second prong of Listing 12.05C requires an examination of Plaintiff's impairments and their impact on her ability to work. ALJ Hoffman previously identified "a seizure disorder and a mental retardation disorder" as severe impairments in his 2007 findings. *See* AR 13. However, following remand, the ALJ identified Plaintiff's severe impairments as "a seizure disorder and borderline intellectual functioning." AR 324. Recent authority holds that a diagnosis of mental retardation is not required to meet Listing 12.05. *Christner v. Astrue*, 498 F.3d 790, 793 (8th Cir. 2007) ("[W]e have specifically held that a formal diagnosis of mental retardation is not required to fall within the confines of section 12.05. Thus, it is clear that claimants need only meet the listing requirements stated in section 12.05. The ALJ erred in giving any credence to the lack of a diagnosed mental deficiency in [this] case"); *see also Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir. 1987) (recognizing that a claimant can meet the impairment of mental retardation based on a single valid IQ score). Thus, to the degree the ALJ noted a lack of a diagnosis of mental retardation, it has no bearing on whether a claimant could be found disabled under Listing 12.05.

In this Circuit, a finding of severe impairment at step two is a *per se* finding of "impairment imposing additional and significant work-related limitation of function" as employed in the second prong of Listing 12.05C. *See Fanning v. Bowen*, 827 F.2d at 633; *Taylor v. Astrue*, 2011 WL 4055243 at *18 (E.D. Cal. Sept. 12, 2011); *Pedro v. Astrue*, 2011 WL 1100214 (D. Or. Mar. 23, 2011) at *8; *Campbell v. Astrue*, 2011 WL 444783 at * 18 (E.D. Cal. Feb. 8, 2011); *Strokes v. Astrue*, 2011 WL 285224 at * 10 (D. Or. Jan. 4, 2011); *Rhein v. Astrue*, 2010 WL 4877796 at *10 (Nov. 23, 2010); *Huber v. Astrue*, 2010 WL 4684021 (D. Ariz. Nov. 12, 2010) at *2; *Rowens v. Astrue*, 2010 WL 3036478 (E.D. Cal. Aug. 2, 2010) at *3; *see also Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *Edwards v. Heckler*, 736 F.2d 625, 629-31 (11th Cir. 1984); *Nieves v. Secretary of Health & Human Servs.*, 775 F.2d 12, 14 & n. 7 (1st Cir. 1985).

1    ALJ Hoffman's finding at step three that Plaintiff's seizure disorder does not impose

2  additional and significant work-related limitation ignores the Ninth Circuit authority that a

3  finding at step two is a *per se* finding of such an impairment.  In the five-step sequential process

4  used to evaluate an applicant's disability status, step two consists of determining whether a

5  claimant has a "medically severe impairment or combination of impairments."  *Bowen v.*

6  *Yuckert*, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).  Like he did in his first

7  decision (*see* AR 13), ALJ Hoffman explicitly identified Plaintiff's "seizure disorder" as an

8  impairment that "significantly affect[s] the claimant's ability to perform work-related activities

9  and [is], therefore, severe" at step two.  AR 324.  Defendant argues "the ALJ probably should not

10  have characterized Plaintiff's seizure disorder as a 'severe' impairment under step two," and that

11  Plaintiff's reliance upon "case law directing that Listing 12.05C is met whenever a claimant has

12  mental retardation and another impairment deemed 'severe' . . . evinces a too narrow

13  interpretation of the Listing requirement and its intersection with step two."  (Doc. 21 at 17.)

14  Notably, Defendant did not expressly address the *Fanning* decision.  In any event, this Court is

15  not persuaded by the Commissioner's argument and it has previously interpreted *Fanning* as

16  applied above.

17    In sum, Plaintiff has established that she meets Listing 12.05C, and thus, the ALJ's

18  finding to the contrary is not supported by substantial evidence nor is it free of legal error.

19    ***Reversal with Award of Benefits is Appropriate***

20    The decision whether to remand a matter pursuant to sentence four of Title 42 of the

21  United States Code section 405(g) or to order immediate repayment of benefits is within the

22  discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  When a

23  court reverses an administrative agency determination, the proper course, except in rare

24  instances, is to remand to the agency for additional investigation or explanation.  *Moisa v.*

25  *Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002).

26  Generally, an award of benefits is directed only where no useful purpose would be served by

27

28                                          14

1    further administrative proceedings or where the record is fully developed.  *Varney v. Secretary of*

2    *Health and Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988).

3        In this case, and for reasons given above, the Court finds no useful purpose would be

4    served by further administrative proceedings.  Additionally, this Court finds the record to be fully

5    developed.  Plaintiff has established that she meets the listing for mental retardation and is

6    therefore "presumed disabled, and no further inquiry is necessary."  *Baxter v. Sullivan*, 923 F.2d

7    1391, 1395 (9th Cir. 1991).

8        Finally, in light of this decision, the Court did not consider Plaintiff's remaining

9    argument that the ALJ failed to comply with the remand order.  *See Byington v. Chater*, 76 F.3d

10    246, 250-51 (9th Cir. 1996) ("Because we find that the district court committed error and the

11    decision of the ALJ is supported by substantial evidence, we do not consider the [] other

12    arguments on appeal").

13                          **CONCLUSION**

14        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

15    substantial evidence in the record as a whole and is not based on proper legal standards.

16    Accordingly, this case is REMANDED to the Commissioner of Social Security for a calculation

17    of benefits only.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff

18    Chizoma C. Njoku and against Defendant Michael J. Astrue, Commissioner of Social Security.

19

20

21      IT IS SO ORDERED.

22    **Dated:   September 21, 2011**              **/s/ Gary S. Austin**

                                        UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28                       15